UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

      Plaintiff,

v.                                Case No. 6:26-cv-

ASSETS IDENTIFIED IN
PARAGRAPH ONE OF
VERIFIED COMPLAINT

      Defendants.

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Plaintiff, the United States, brings this complaint and alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.     This is a civil action in rem, to forfeit to the United States of America, the following defendant property:

### A.  Real Properties

    (1)    The real property located at 5271 Isleworth Country Club Drive, Windermere, Florida 34786, titled in the name of Christopher Delgado, including all improvements thereon and appurtenances thereto, the legal description for which is as follows:

        Lots 228 and 229, Isleworth, according to the map or plat thereof, as recorded in Plat Book 16, Pages 118 through 130, inclusive, of the Public Records of Orange County, Florida.

        Property Identification Number: 16-23-28-3899-02280;

(2) The real property located at 141 S. Phelps Avenue, Winter Park, Florida 32789, titled in the name of Christopher Delgado and Andie Delgado, including all improvements thereon and appurtenances thereto, the legal description for which is as follows:

Lot 14, Windsong - Lakeside Section One, according to the plat thereof as recorded in Plat Book 43, Page 70, Public Records of Orange County, Florida.

Property Identification Number: 08-22-30-9362-00140;

(3) The real property located at 17416 Bal Harbour Drive, Winter Garden, Florida 34787, titled in the name of Habibi Holdings LLC, including all improvements thereon and appurtenances thereto, the legal description for which is as follows:

Lot 291, of Waterside on Johns Lake - Phase 2B, according to the plat thereof, as recorded in Plat Book 93, Page 65, of the Public Records of Orange County, Florida.

Property Identification Number: 06-23-27-8903-02-910;

(4) The real property located at 222 Pawnee Trail, Kissimmee, Florida 34747, titled in the name of Christopher Delgado, including all improvements thereon and appurtenances thereto, the legal description for which is as follows:

Lot 280, Happy Trails Unit 4, according to the Plat thereof, as recorded in Plat Book 2, at Page 196, of the Public Records of Osceola County, Florida.

Property Identification Number: 20-25-27-3303-0001-2800;

(5) The real property located at 189 S. Orange Avenue, Unit 1800S, 1810S, 1820S, and 1870S, Orlando, Florida 32801, titled in the name of Habibi HQ LLC, including all improvements thereon and appurtenances thereto and rights to approximately 30 associated parking spots, the legal description for which is as follows:

Unit Numbers 1810S, 1820S, 1800S and 1870S, of The Plaza South Tower Commercial Condominium, a Condominium, according to The Declaration of Condominium recorded in O.R.

Book 8820, Page 4417, and all exhibits and amendments thereof, and recorded in condominium Book 35, Page 67 and Condominium Book 40, Page 1, Public Records of Orange County, Florida.

Property Identification Numbers: 26-22-29-7157-18-000; 26-22-29-7157-18-100; 26-22-29-7157-18-200; and 26-22-29-7157-18-700;

Together with, by Assignment of Parking Easement Agreement, the rights to use and occupy the following parking spaces in the Parking Unit of the Plaza Land Condominium:

Parking Space Nos.: 768, 769, 770, 772, and 773 [5 spaces associated with Unit 1800S]

Parking Space Nos.: 658, 659, 660, 661, 664, 665, 666, 667, 668, 669, 670, 671, and 672 [13 spaces associated with Unit 1820S]; and

Parking Space Nos.: 727, 728, 760, 761, 762, 763, 764, 765, 766, 767, 788, and 789 [12 spaces associated with Unit 1870S];

(6) The real property located at 7333 Bella Foresta Place, Sanford, Florida 32771, titled in the name of Christopher Alexander Delgado, including all improvements thereon and appurtenances thereto, the legal description for which is as follows:

Lot 1, Bella Foresta Replat, a subdivision according to the plat thereof recorded in Plat Book 77, Pages 55 and 56, of the Public Records of Seminole County, Florida.

Property Identification Number: 27-19-29-505-0000-0010; and

(7) The real property located at 746 Cavan Drive, Apopka, Florida 32703, titled in the name of Christopher Delgado and Andie Delgado, including all improvements thereon and appurtenances thereto, the legal description for which is as follows:

Lot 180, Breckenridge Phase II, according to the map or plat thereof, as recorded in Play Book 68, Page(s) 150 through 153, inclusive, of the Public Records of Orange County, Florida.

Property Identification Number: 08-21-28-0881-01-800.

**B.    <u>Vehicles</u>**

(1)    2025 Lamborghini Revuelto, VIN: ZHWUC1ZM9SLA02300, registered to Christopher Delgado;

(2)    2024 Rolls Royce Ghost, VIN: SCATD6C02RU222648, registered to Goliath Ventures, Inc. and Christopher Delgado;

(3)    2024 Bentley Bentayga, VIN: SJAHT2ZV0RC025272, registered to Christopher Delgado and Andie Delgado;

(4)    2024 Lamborghini Huracán EVO Spyder, VIN: ZHWUT4ZFXRLA26330, registered to Goliath Ventures, Inc. and Christopher Delgado

(5)    2025 Cadillac Escalade V, VIN: 1GYS9HR95SR147650, registered to Goliath Ventures, Inc.;

(6)    2024 Lincoln Navigator L, VIN: 5LMJJ3TG2REL19131, registered to Goliath Ventures, Inc.;

(7)    1951 Mercury, VIN: 51DA24185M, registered to David Stuart;

(8)    2017 Mercedes Benz C300, VIN: 55SWF4JBXHU230429, registered to Goliath Ventures, Inc.;

(9)    2023 Rolls Royce Cullinan, VIN: SLATV4C02PU217321, registered to Goliath Ventures, Inc. and Christopher Delgado;

(10)    2022 Mercedes Benz Sprinter, VIN: W1X8EC3Y6NT121984, registered to Goliath Ventures, Inc.; and

(11)    2022 GMC Sierra HD, VIN: 1GT49PEY2NF310721, registered to David Stuart.

(collectively, "the Defendant Assets").[1]

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over an action commenced by the United States by virtue of 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355.

3.    This Court has *in rem* jurisdiction over the Defendant Assets pursuant to 28 U.S.C. § 1355(b)(1)(A), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

4.    Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1355(b)(1), because pertinent facts or omissions giving rise to the forfeiture occurred in this District.

5.    The Defendant Assets fall into two categories.

a.    Nine of the vehicles are in the government's possession, custody, and control. Therefore, the United States requests that the Clerk of Court issue an arrest warrant *in rem*, upon the filing of the complaint, pursuant to Supplemental

---

[1] Since February 2026, the United States has been seizing assets traceable to the fraud scheme perpetrated by Christopher Delgado and others through Goliath Ventures, Inc. The Defendant Assets are a particular subset of forfeitable assets that are expensive to maintain and either depreciating in value, secured by liens and/or subject to property taxes that are continuing to accrue significant interest and may be in default. In order to maximize the recovery of fraud proceeds, the United States has determined that these assets must be forfeited as expeditiously as possible.

5

Rule G(3)(b)(i). The United States will then execute the warrant on the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

b.    The two vehicles titled to David Stuart are not in the government's possession, custody, or control. Therefore, the United States requests that the Court, on finding probable cause, issue an arrest warrant *in rem*, pursuant to Supplemental Rule G(3)(b)(ii). The United States will then execute the warrant on the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

c.    Pursuant to Rule G(3)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and 18 U.S.C. § 985(c)(1), a notice of this forfeiture, as well as a copy of the complaint, shall be posted on each real property and served on the owners of the real property. Thereafter, neither the issuance of a warrant *in rem* nor any other action will be necessary for the Court to establish *in rem* jurisdiction over the subject real properties. 18 U.S.C. § 985(c)(3).

**STATUTORY BASIS FOR FORFEITURE**

6.    The Defendant Assets represent proceeds of a violation of 18 U.S.C. § 1343 and are, therefore, subject to civil forfeiture by the United States, pursuant to 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7). 18 U.S.C. § 981(a)(1)(C). Section 1956(c)(7)(A) incorporates the

6

racketeering offenses under 18 U.S.C. § 1961. A wire fraud offense in violation of 18 U.S.C. § 1343 is a specified unlawful activity under 18 U.S.C. § 1961(1).

7.      Additionally, the monetary transactions made to purchase the Defendant Assets, excluding the Rolls Royce Cullinan and 746 Cavan Drive property, were conducted in violation of 18 U.S.C. § 1957 because they were knowingly conducted with more than $10,000 in funds derived from specified unlawful activity (specifically, wire fraud), and, as such, they are subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

8.      Specific facts supporting the forfeiture of the Defendant Assets have been provided by Richard Smith, Special Agent of the Internal Revenue Service, Criminal Investigation, who states as follows:

## FACTS

### I.      OVERVIEW OF WIRE FRAUD SCHEME

9.      As set forth in more detail below, Christopher Delgado operated Goliath Venture, Inc. (first as a Florida corporation and later as a Wyoming corporation, collectively "Goliath") as a Ponzi scheme whereby victims were solicited to invest[2] substantial sums of money under false and fraudulent promises of

---

[2] Goliath's Joint Venture Agreement contained a provision that stated "[t]he Parties acknowledge and agree that this Agreement, and the Joint Venture and activities contemplated hereunder, are not an investment product, investment offering, investment advice, or a security in any way whatsoever." Regardless, many of the victims understood the money they sent to Goliath to be for investment purposes because they expected to receive returns on the money based on Goliath's marketing materials and their contracts.

monthly returns, which were sometimes presented as guaranteed or low risk, generated through cryptocurrency "liquidity pools." Victims were induced to give money to Goliath through personal referrals, professional marketing materials, luxury events, charitable sponsorships, and some monthly payments of purported returns, all of which were designed to establish Goliath's bona fides with investors. Because of these false and fraudulent representations, Delgado and his co-conspirators obtained at least $400 million from more than 1,000 victim investors.

10.    Although Delgado and his co-conspirators represented that Goliath would place the funds it obtained from victim investors in cryptocurrency liquidity pools, in reality, investor funds were used to pay purported returns to earlier investors, to return principal to investors who requested it, and for Delgado's personal expenditures. No funds were invested into liquidity pools.

11.    For example, between August 2024 and September 2025, Delgado used almost $14 million in victim funds (fraud proceeds) to buy himself residential real properties in the Orlando metropolitan area.

12.    Delgado and his co-conspirators took various steps to hide the fraudulent scheme from the investors and to maintain their trust, including: (1) providing investors fabricated statements related to their investment that purported to show returns when there were none, (2) providing investors with bogus explanations for delayed payments and redemptions, and (3) allowing some investors to collect more money from Goliath than they initially invested, which allowed Goliath to

continue operating because investors did not realize their returns were paid from other investors' money.

13.     Beginning in late 2025, when investors attempted to withdraw their principal or purported returns, Goliath delayed payments, provided shifting explanations, and ultimately restricted or terminated investor access to purported information about their investments.

## II.    RELEVANT TERMS

14.     A "Ponzi scheme" is a form of investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. Rather than engaging in any legitimate investment activity, the fraudulent actors focus on attracting new money to make promised payments to earlier investors as well as to divert "invested" funds for personal use.

15.     "Fiat currency" is any type of government-issued currency, such as the United States dollar, that is used as legal tender by a specific nation, government, or region's citizens. Fiat currency is not backed by a physical commodity, but instead by the government that issued it.

16.     "Cryptocurrencies," such as Bitcoin and USD Coin ("USDC"), are electronically sourced units of value that exist on the internet. USDC is a U.S. dollar-pegged cryptocurrency designed to maintain a value of one U.S. dollar per token.

Cryptocurrencies are generated and tracked through computer software in a peer-to-peer network, rather than issued from a government or other entity. Users of cryptocurrencies send units of value to and from "addresses," which are unique strings of numbers and letters that function like a public account number. Cryptocurrency transactions are recorded on a publicly available, distributed ledger, often referred to as a "blockchain."

17.    A "blockchain" is a distributed database maintained across a network of computers. Each transaction is grouped into a "block," which is then cryptographically linked to the previous block, forming a chronological and tamper-resistant chain. Once a transaction is recorded on the blockchain, it cannot be altered or deleted without detection.

18.    Cryptocurrency ownership is controlled by cryptographic keys. A "public address" functions similarly to a bank account number and is used to receive cryptocurrency. A corresponding "private key" is required to authorize transactions and transfer cryptocurrency from one address to another. Possession of the private key allows the holder to control and move the cryptocurrency. Private keys may be stored in various forms, including software applications, hardware devices, written records, or cloud-based storage.

19.    Cryptocurrency may be stored in digital "wallets," which can exist as applications on computers or mobile devices, online accounts hosted by cryptocurrency exchanges, or specialized physical devices known as hard wallets.

20.     A "cryptocurrency exchange," such as Coinbase, is a type of digital currency exchange where cryptocurrency can be bought, sold, and traded for fiat currency or other digital assets.

21.     Coinbase is a United States-based cryptocurrency exchange and financial technology company that operates an online platform through which individuals and entities can buy, sell, transfer, store, and manage digital assets, including cryptocurrencies such as Bitcoin and USDC. Coinbase provides hosted digital wallets, brokerage services, and trading functionality that allow users to convert fiat currency into cryptocurrency and vice versa. Coinbase accounts are typically associated with verified user identities and may be linked to bank accounts, debit cards, or other payment methods to facilitate deposits and withdrawals. The platform maintains records of account activity, including transactions, transfers, and balances.

22.     A "decentralized exchange" is a peer-to-peer marketplace that connects cryptocurrency buyers and sellers. In contrast to centralized exchanges, such as Coinbase, decentralized platforms are non-custodial, meaning a user remains in control of their private keys when transacting on a decentralized exchange. In the absence of a central authority, decentralized exchanges employ smart contracts that self-execute under set conditions and record each transaction to the blockchain.

23.   A "smart contract" is a digital agreement stored and executed on a blockchain network. Smart contracts are programmed to perform specific actions once predefined conditions trigger them.

24.   A "liquidity pool" is a crowdsourced pool of coins or tokens that are locked in a smart contract and used to facilitate trades between those assets on a decentralized exchange. Liquidity pools enable users to buy and sell cryptocurrency on decentralized exchanges or "DeFi" platforms, such as Uniswap, without the need for centralized exchange.

25.   Liquidity pools are typically funded by individuals who deposit pairs of cryptocurrency tokens into the pool. Depositors typically receive a portion of transaction fees or other incentives generated by trading activity within the pool. Trades conducted through liquidity pools are executed automatically by smart contracts. These formulas adjust the price of assets in the pool based on supply and demand. As trade occurs, the balances of the pooled assets change, and the value of a depositor's share of the pool may increase or decrease accordingly.

26.   Goliath, formerly known as Gen-Z Venture Firm, was established in Florida in February 2019. Delgado served as the President and a Director of Gen-Z Venture Firm. In September 2021, Gen-Z Venture Firm changed its name to Goliath. Delgado served as the President and Chief Executive Officer of Goliath.

27.   According to information provided to potential investors, including marketing materials and Goliath's website, Goliath is "a joint venture private fund

that invested in blockchain and cryptocurrency projects." Goliath further characterized itself as "a pioneering firm specializing in blockchain development and decentralized finance strategies" and purported to leverage "liquidity pools to facilitate passive income generation, enhance market efficiency, and provide qualified investors with access to innovative financial opportunities." Those representations were false.

### III.    THE WIRE FRAUD SCHEME

#### A.    Solicitation of Investor Funds, Contracts, and Goliath's Online Portal

28.    From January 2023 through January 2026, Delgado and Goliath directors falsely told investors through presentations and marketing materials that their funds would move from one of Goliath's traditional bank accounts to Coinbase, then to an "encrypted ledger," and ultimately into liquidity pools where returns would be generated. The following is a representation of Goliath's purported investment cycle as presented to investors through marketing materials.



29.     From January 2023 through January 2026, Goliath entered into "Joint Venture Agreements" with victim investors. These agreements were often signed by Delgado on behalf of Goliath. In these agreements, Goliath would "partner" with victim investors and purport to enter a joint venture that would utilize investor funds to make deposits into liquidity pools. The Joint Venture Agreements outlined terms and conditions of the investments, including details about how Goliath would invest in liquidity pools and the distribution of the return on the investors' investment. The Joint Venture Agreements sometimes guaranteed monthly returns ranging from three to eight percent or the return of an investor's principal. Investors were offered the option to withdraw their monthly return or "roll over" monthly returns, increasing

14

their account balances. Goliath employed associates, known as directors, who were responsible for soliciting investors on behalf of Goliath. Goliath represented to investors that the company would generate its revenue by charging fees to investors.

30.    Investors could access their account through an online portal, including a mobile application. Goliath purported to provide investors with regular account updates through their online portals. Those account updates reflected consistent monthly gains.

31.    Unfortunately, the account information falsely reflected what Delgado wanted investors to believe. In reality, there were no investment gains. Like the information provided in the investment materials and contracts, the information on the online portal was false and fraudulent as the investors' funds were neither used as promised nor used for any investment activity. Instead, before Delgado spent them, investor funds were maintained as cash in Goliath's bank accounts and cryptocurrency wallets.

**B.    Goliath's Bank Accounts and Coinbase Wallets**

32.    Delgado directed investor funds into numerous bank accounts held across different financial institutions. These accounts were used not only to receive deposits directly from investors but also to transfer funds among one another. The investigation further showed that Delgado opened at least 30 bank accounts, often with co-signers, in the names of corporations that Delgado created for the purpose of receiving and moving victims' funds. Investors' funds deposited into one account

15

were often transferred to other Delgado-controlled accounts. In fact, funds were moved amongst and between accounts so frequently that there often did not appear to be a legitimate business purpose for the transfers.

33.    In at least some instances, Delgado appears to have opened new accounts at different banks because his primary gave him notice that it would be closing his accounts. For instance, in June 2025, JPMorgan Chase Bank ("JPMC") closed the Goliath accounts and, in January 2026, Bank of America ("BOA") closed the Goliath accounts that Delgado had opened in late May 2025, presumably after learning JPMC intended to close its Goliath accounts.[3]

34.    The financial activity of the accounts revealed a network of JPMC, BOA, Luminate Bank ("LMB"), and City National Bank ("CNB") accounts that either received funds directly from investors or obtained funds through transfers originating from initial investor-funded accounts. The following is a partial list of the business and personal bank accounts funded with proceeds for which Delgado had signatory authority (solely or with others):

| # | Bank | Account Name | Account # Ending | Date Opened |
|---|------|--------------|------------------|-------------|
| 1 | JPMC | Goliath Ventures Inc | 0305 | 2/11/2022 |
| 2 | JPMC | Goliath Ventures Inc | 2695 | 1/27/2025 |
| 3 | JPMC | Goliath Ventures Inc | 8119 | 2/11/2022 |

---

[3] Banks close accounts when they are concerned about high-risk or criminal activity, including activity that appears consistent with a Ponzi scheme. Examples of such Ponzi-like activity in Goliath accounts include high volumes of inconsistent deposits (wire transfers); high volumes of rapid, unexplained transfers between accounts; and rapid growth in deposits coupled with a vague business model.

| # | Bank | Account Name | Account # Ending | Date Opened |
|---|------|--------------|------------------|-------------|
| 4 | JPMC | Kingsmen Group LLC | 8893 | 3/22/2023 |
| 5 | JPMC | Christopher Delgado | 7735 | 7/18/2022 |
| 6 | JPMC | Habibi Holdings Inc | 5775 | 2/6/2025 |
| 7 | JPMC | Habibi HQ LLC | 2351 | 5/29/2024 |
| 8 | JPMC | Kingsmen International Group | 4092 | 5/28/2024 |
| 9 | JPMC | Kingsmen Group LLC | 9206 | 3/21/2024 |
| 10 | JPMC | GVI International Inc | 7812 | 6/20/2025 |
| 11 | BOA | Christopher & Andie Delgado | 0514 | 2/24/2012 |
| 12 | BOA | Goliath Ventures Inc | 9136 | 5/15/2025 |
| 13 | BOA | Goliath Ventures Inc | 9149 | 5/15/2025 |
| 14 | BOA | GVI International Inc | 0475 | 5/20/2025 |
| 15 | BOA | GVI International Inc | 0488 | 5/20/2025 |
| 16 | BOA | Goliath Ventures Inc | 3605 | 5/20/2025 |
| 17 | BOA | Habibi HQ LLC | 8364 | 5/20/2025 |
| 18 | BOA | Habibi HQ LLC | 8377 | 5/20/2025 |
| 19 | BOA | Christopher Delgado | 2609 | 6/24/2025 |
| 20 | LMB | Built Different Enterprise LLC | 2023 | 8/27/2025 |
| 21 | LMB | Christopher Delgado or Nadia Bringas | 2082 | 8/27/2025 |
| 22 | LMB | Goliath Ventures Inc | 1345 | 8/14/2025 |
| 23 | LMB | Goliath Ventures Inc | 1353 | 8/14/2025 |
| 24 | LMB | Goliath Ventures Inc | 1892 | 8/22/2025 |
| 25 | LMB | GVI International Inc | 1973 | 8/27/2025 |
| 26 | LMB | Habibi HQ LLC | 2015 | 8/27/2025 |
| 27 | LMB | Kingsmen International Group LLC | 2074 | 8/27/2025 |
| 28 | LMB | Kingsmen Group LLC | 2058 | 8/27/2025 |
| 29 | LMB | GVI International Inc | 1981 | 8/27/2025 |
| 30 | LMB | Habibi Holdings LLC | 2031 | 8/27/2025 |
| 31 | CNB | GVI International Inc. | 9574 | 12/18/2025 |
| 32 | CNB | Christopher Delgado | 3966 | 1/5/2026 |

35.     As accounts were closed, Delgado systematically transitioned to other financial institutions to ensure the continued flow of investor funds and maintain the

ongoing operation of the scheme. As will be addressed below, some of these accounts were subsequently used to promote the scheme, live a lavish lifestyle, purchase high-value assets such as vehicles, real property, and jewelry, and pay investors using investor money rather than legitimate business revenue.

36. As referenced above, while in operation, Goliath held business bank accounts at JPMC and BOA, including a JPMC account ending in 0305 ("JPMC 0305") and a BOA account ending in 9136 ("BOA 9136").

37. Delgado was the sole signatory on Goliath's JPMC 0305 account, which meant that he had ultimate control of the account. Goliath directors told at least one investor that Delgado determined how investor funds would be allocated and directed transfers from Goliath accounts. In addition, bank records establish that Delgado used funds from this account for several personal expenditures, including the purchase of some of the Defendant Assets as discussed below. The fact that Delgado used the account to fund his personal expenses also demonstrates that he had ultimate control of the account.

38. Delgado also was a co-signer on Goliath's BOA 9136 account. While other individuals may have had access to the account, Goliath directors told at least one investor that Delgado controlled the account and that he determined how investor funds would be allocated and directed transfers from the account. In addition, Delgado used funds from the account for several personal expenditures, including the purchase of some of the Defendant Assets. As with Goliath's JPMC

0305 account, Delgado's use of Goliath's BOA 9136 account to fund his personal expenses demonstrates that he had ultimate control of the account.

39.    Delgado was the sole signatory on Goliath's Coinbase wallets. Goliath directors told at least one investor that Delgado determined how investor funds were allocated and directed transfers from this wallet.

40.    Funds sent to Goliath from investors were primarily deposited into the JPMC 0305 account or the BOA 9136 account or transferred directly to Goliath's wallets at Coinbase. For example:

      a.    From January 2023 through June 2025, approximately $253 million was deposited into the JPMC 0305 account.

      b.    From May 2025 through September 2025, approximately $75 million was deposited into the BOA 9136 account.

      c.    From January 2023 through January 2026, approximately $62 million was received by Goliath's wallets at Coinbase.

41.    From January 2023 to September 2025, approximately $165 million was sent to Goliath's Coinbase wallets from the JPMC 0305 account and the BOA 9136 account.

      a.    From January 2023 through June 2025, approximately $123 million from the JPMC 0305 account to Goliath's wallets at Coinbase.

b.    From May 2025 through September 2025, approximately \$42 million from the BOA 9136 account to Goliath's wallets at Coinbase.

### C.    The Fraud

42.    Delgado, individually and through authorized representatives, made the following false and fraudulent representations to victim investors to induce them to give money to Goliath purportedly for deposits into cryptocurrency liquidity pools:

a.    Goliath's marketing materials represented to investors that their funds would be deployed into a structured and actively managed DeFi liquidity pool strategy, primarily focused on USDC pairing on Uniswap. The materials described sophisticated risk management tools—including stop-loss mechanisms, slippage monitoring, and centralized exchange hedging—and portrayed the strategy as a disciplined, yield-generating liquidity pool program designed to benefit accredited investors. These representations were materially false and misleading because, despite raising approximately hundreds of millions of dollars from investors, Goliath deployed only about \$1 million into any liquidity pool. The overwhelming majority of investor funds were not used in the liquidity pool strategy described in marketing materials, directly contradicting the core representations that investor capital would be allocated to and managed within such DeFi liquidity pools.

b.    The Joint Venture Agreement ("Agreement"), which Goliath commonly presented to investors, falsely represented to the victim investors that their

funds would be invested into cryptocurrency liquidity pools. The Agreement falsely assured the investors that the liquidity pools would run on one or more exchanges (such as Uniswap).

c.      The Agreement falsely represented to the investors that any profits generated from a Venture would be distributed on a monthly basis and that the investor had the option of selecting either a monthly payout or a monthly rollover wherein the profits would be reinvested.

d.      The Agreement falsely represented to the investors that an investment in a Venture would generate a monthly return on investment of three to eight percent. Returns were sometimes described as guaranteed, and some investors were told that their principal was guaranteed.

e.      The Agreement falsely represented to investors that they could remove their money at any time.

f.      Delgado often signed these contracts on behalf of Goliath.

g.      Goliath provided investors with access to an online account portal that purported to display real-time account activity, including invested principal and returns earned. While the amounts of principal "invested" (received by Goliath) were accurately reflected, the reported returns were materially false and misleading. In reality, little to no investor funds were deployed into the investment strategy described, and the "returns" displayed in the portal were not generated from actual trading or liquidity pool activity. Instead, the returns were artificially

calculated and manipulated to match the rate of return offered to each investor, creating the false appearance of legitimate investment performance.

43.     Based on analysis of bank records and blockchain for the period January 2023 through January 2026, Goliath did not invest any investor funds in cryptocurrency investments. Instead, Goliath used investor funds to pay phony returns to earlier investors. Despite false representations to investors, investor funds were either held in traditional bank accounts or, if they converted to cryptocurrency, were held as USDC, a cryptocurrency "stablecoin" which is pegged to the United States dollar.

44.     Chainalysis Government Solutions, LLC ("CGS")[4] analyzed the flow of cryptocurrency related to Goliath's known cryptocurrency wallets, including relevant documents from Coinbase exchange and investors, through a blockchain analysis. CGS analysis confirmed that investor funds were moved between traditional accounts or converted to USDC, but they were not deposited into liquidity pools. The funds from Goliath's cryptocurrency wallets were transferred to wallets held by representatives of Goliath and to wallets held by investors.

45.     For example, from January 2023 through June 2025, approximately $50 million from the JPMC 0305 account was sent to investors purportedly as returns on investments. Although Goliath falsely represented that these payments were returns

---

[4] CGS provides blockchain analysis and investigation software (Reactor) to government agencies. Reactor allows investigators to trace and visualize, across multiple blockchains, transactions linked to criminal activity.

on investments, they primarily were funded with money held in the JPMC 0305 account that investors sent to Goliath for investing purposes. They were not returns from any investment activity.

46.     From May 2025 through September 2025, approximately $11 million from the BOA 9136 account was sent to investors purportedly as returns on investments. These funds primarily originated from funds held in the BOA 9136 account that investors sent to Goliath for investing purposes and were not returns from any investment activity.

47.     Funds from investors were also used to pay for Goliath's corporate spending, including payments for corporate credit cards, extravagant business gatherings, and luxury travel, including more than $12 million on chartered flights, ground transportation and events. In December 2025, at a time when he was telling investors he could not return money to them because of audits, banking issues, and compliance matters, Delgado paid approximately $9 million to host a Goliath Christmas party in Miami.

48.     Investors' balances and returns reflected in the Goliath accounts, as provided to investors through Goliath's online portal, were fictitious and not tied to actual investment of their money in a liquidity pool. Instead, balances were artificially manipulated to reflect promised returns, creating a false appearance of consistent profitability. For example, account overviews for Goliath investors reflected "Monthly Distribution Rates" and "Monthly Distribution Balances" that

23

purported to reflect returns on investment. In reality, there were no such returns. An example of a Goliath account overview is pictured below; it demonstrates that the information provided to investors was simplistic and did not show any investment- or liquidity-pool-specific particulars.

| | |
|---|---|
| Current Account Balance | $122,892.84 |
| Monthly Distribution Balance | $6,144.64 |
| Total Contributions | $0.00 |
| Monthly Distribution Rate | 5.00% |
| Exec Partner | ███████ |
| User ID | ███████ |

### D.    Investor 1

49.    Investor 1, a resident of Seminole County, Florida, lost approximately $720,000 after being solicited by Goliath and being given false promises about how investor money would be used.

50.    Investor 1 was introduced to Goliath through an acquaintance, who told Investor 1 that he had invested approximately $1,000,000 with Goliath and was receiving consistent monthly returns. The acquaintance introduced Investor 1 to a representative of Goliath. During an in-person meeting in Seminole County, Florida, the Goliath representative and the acquaintance presented Investor 1 with an

investment opportunity described as participation in cryptocurrency liquidity pools with guaranteed monthly returns of seven percent.

51. Investor 1 was instructed to establish a Coinbase account to receive payouts. In March 2023, he initially invested $10,000 and received a first-month payout of approximately $700, representing a seven percent monthly return. The initial payment and subsequent payments were timely and consistent, which reinforced Investor 1's belief that the investment was legitimate and low risk.

52. Goliath's agreement with Investor 1 was memorialized in a "Joint Venture Agreement" on June 23, 2023. Delgado signed the agreement on behalf on Goliath. The agreement falsely represented that the funds would be invested in liquidity pools:

> **3. JOINT VENTURE**
>
> 3.1. In executing this Agreement, the Parties have agreed to enter a joint venture for the purpose of carrying out the particular project of utilizing their cryptocurrencies by making Contributions into liquidity pools which shall run on one or more exchanges (such as Uniswap) and shall involve the pairing of a combination of cryptocurrencies to exchanges wherein, in lieu of interest, an exchange pays exchange fees for the use of the pairing to create liquidity. Each liquidity pool that the Parties collectively decide to contribute to shall be considered a "**Venture**".

53. The agreement also set forth the so-called "Distribution of Profits" and guaranteed a return of seven percent monthly:

> **6. DISTRIBUTION OF PROFITS**
>
> 6.1. From any profits that are made, the distribution of profits will be as follows:
>
> 6.1.1. The Partner shall be entitled to monthly profits generated by its Contributions, ("**Profit(s)**"):
>
> 6.1.1.1. **For Ethereum, Bitcoin, and USDC:** profit margins will deliver 7% monthly, paid in USDC.

25

54.     In December 2023, Investor 1 attended a Goliath-hosted investor event at the Four Seasons Resort in Orlando, Florida. The event was extravagant and professionally organized, with numerous attendees—further reinforcing Investor 1's belief that Goliath was a legitimate, well-capitalized enterprise.

55.     In May 2024, Investor 1 became involved with a charitable organization and learned that Goliath was a major sponsor. Through this involvement, Investor 1 met Delgado, whose public association with charities and community events further induced Investor 1 to believe Goliath was a legitimate business.

56.     Based on the representations about the cryptocurrency liquidity pool investment made by the Goliath representative and the acquaintance and the consistency of the early payouts, Investor 1 continued investing additional funds and reinvesting purported returns. Between mid-2023 and late-2024, Investor 1 invested approximately $720,000. Of this amount, approximately $420,000 was transmitted via domestic wire transfers from Investor 1's personal bank account, and approximately $300,000 was transmitted via cryptocurrency transfers from Investor 1's Coinbase account to wallet addresses provided by Goliath. Specifically, on or about the following dates, Delgado, for the purpose of executing the wire fraud scheme and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly, and with intent

to defraud, cause Investor 1 to transmit by means of wire in interstate commerce, the following funds:

      a.  $40,000 on February 1, 2024; and

      b.  $110,000 on March 26, 2025.

57.    In late 2025, Goliath began delaying payments to the victim investors and attributed the delays to audits, banking issues, and compliance matters. Despite repeated assurances made by Goliath that payments would resume, the explanations changed over time, and no supporting documentation was provided. Investor 1 was advised that payments would resume on or about December 18, 2025, however, no additional payments were ever made.

58.    In early January 2026, Investor 1 requested an exit from the "Joint Venture" with Goliath and requested a return of $862,000 in principal and accrued returns. On January 9, 2026, Goliath represented that his funds would be returned:



This thread is correct. We have your exit pending signature and between our pending pay (October and November) we have a total of $862,800 going back to you.

$42,000 for October
$50,400 for November
$720,000 exit for December and the earned distribution of $50,400.

Best,





goliathventuresinc.com

59.     After Investor 1 contacted his bank to request wire reversals[5] and filed a police report with the Seminole County Sheriff's Office, Goliath was contacted by Bank of America regarding the reversal. Shortly thereafter, Investor 1 received a hostile text message from the Goliath representative, stating, "What are you doing man? You recalled funds from Bank of America from May?", demonstrating awareness of the bank inquiry and an attempt to challenge Investor 1's efforts to recover his funds. Investor 1's attempts to recover the funds have been unsuccessful.

---

[5] A wire reversal is a process where the bank that receives a wire transfer returns the funds to the sender's bank. This usually occurs when the receiving bank does not accept the incoming funds. Typically, wires cannot be reversed after the receiving bank has accepted the incoming funds.

60.     By January 2026, Goliath had stopped responding to Investor 1's communications and blocked the investor's access to the Goliath investor application.

### E.    Investor 2

61.     The experience of Investor 2, a resident of Orange County, Florida, demonstrates that Goliath operated as a Ponzi scheme. Investor 2 received his money back, plus the returns he was promised, despite Goliath not using his money as promised. Further, Investor 2's experience shows Delgado's personal involvement with Goliath investors, including pressuring Investor 2 to leave his funds with Goliath.

62.     Investor 2 was referred to Goliath by a representative of Goliath, who told Investor 2 about the representative's own investment with Goliath and about how the monthly returns he received were very good. The representative also stated that Investor 2 could request his principal investment back from Goliath at any time.

63.     Prior to investing in Goliath, in July 2024, Investor 2 met with the Goliath representative and Delgado at a restaurant located in Orlando, Florida. During the dinner, Delgado told Investor 2 about the investment opportunity with Goliath. The investment purportedly utilized liquidity pools and involved money markets and the buying and selling of stock pertaining to cryptocurrency.

64.     In August 2024, Investor 2 invested $1 million with Goliath. The monthly rate of return was five percent, per Investor 2's contract.

65.     In November 2024, Investor 2 spoke to the Goliath representative and Delgado about opportunities involving cryptocurrency. Investor 2 invested an additional $15 million with Goliath in December 2024. The terms of the contract regarding Investor 2's additional investment stated there would be a seven percent monthly return for six months and then a seven and a half percent monthly return for the next six months.

66.     In December 2024, Investor 2 attended a Christmas party hosted by Goliath. During the party, Delgado made an announcement to the attendees that Goliath had secured insurance and a fidelity investment bond that would cover the principal investments made by investors.

67.     After Delgado made the announcement about the insurance and the fidelity bond at the 2024 Christmas party, Investor 2 asked to view documentation pertaining to the insurance and the bond. Delgado declined Investor 2's request for the documentation because of potential disclosure of personal information. Delgado's refusal caused Investor 2 to become uneasy about his investment with Goliath. After Delgado declined Investor 2's request to view the documentation, Investor 2 requested the return of his principal investment.

68.     Delgado sent Investor 2 an email detailing that Delgado was not pleased with Investor 2's request for the return of his principal investment. On January 24, 2025, Delgado emailed Investor 2 stating:

I received your request for a full return of your partnership funds with Goliath. There are two quick points I would like to address before proceeding.

#1 - Per our agreement, the percentage honored on Goliath's part was solely based on maintaining an account over $10M USD (addendum attached)

#2 - Per our conversation, I only allowed such increase in percentage because of the time frame in which you had agreed to have in Goliath.

From the viewpoint of the company, you are taking advantage of the opportunity we have allowed you to be a part of. Secondly, you are not honoring our conversation nor our agreement. At the end of the day, you are completely entitled to your funds, but you are NOT entitled to engage and re-engage with Goliath at your discretion. That is completely up to the company.

We will start to reconvert your funds on Monday back to USD from USDC per your request BUT you will forfeit the January distribution since our agreement and our personal conversation was broken. Secondly, if you wish to re-engage with Goliath, it will be at the SOLE discretion of me and will be at a rate of 1% per month with zero increase based on account value.

I will give you til Sunday to decide if you should liquidate your whole account and if I do not hear from you, we will terminate your agreement and start to wire back your funds next week.

69.     In February 2025, Goliath sent Investor 2 a total of approximately $7.1 million; it sent an additional $10.6 million in March 2025. These funds represented the return of Investor 2's principal investment and purported returns on investment.

31

### F.    Other Victims

70.    Since Delgado was charged in February 2026,[6] approximately 700 investors have completed detailed online victim questionnaires describing their investments, losses, communications with Delgado and others at Goliath, and related supporting information. In addition to the questionnaire responses, investigators have received and reviewed more than 800 emails from investors and potential victims. Investigators have also reviewed extensive supporting documentation submitted by investors, including investment records, account statements, wire transfer records, communications, contracts, screenshots. And, to fully understand the scheme and its impact on victims, investigators have been interviewing investors in Florida as well as throughout the United States and Canada.

71.    The financial impact on victims has been substantial and, in many cases, devastating. Numerous victims reported investing significant portions of their life savings, retirement accounts, home equity, and other personal assets into the scheme based on representations made by Delgado and others. As a result of the losses sustained, many victims have experienced severe financial hardship, including depletion of retirement funds, inability to meet financial obligations, and uncertainty regarding their long-term financial security.

---

[6] *See United States v. Christopher Delgado*, Case No. 6:26-mj-01240-LHP.

72.    Many victims reported that they continued investing additional funds based on repeated assurances and representations made by Delgado and others, which further increased the financial and emotional harm suffered. One victim, who along with his spouse had invested—and lost—nearly everything, shared that what made their now desperate financial position even more painful was that they trusted Delgado. Every time the couple called Delgado or the Goliath Director with whom they worked, they reassured the couple that everything was okay, that it was only a banking issue, and that the payment was coming. Delgado and the Director repeatedly asked them not to remove their money and continued making promises that things would soon be corrected.

## IV.    PURCHASE OF ASSETS WITH FRAUD PROCEEDS

73.    Between January 2023 and December 2025, Delgado's sole source of income was Goliath, and Goliath's sole source of revenue was the wire fraud scheme. As discussed above, throughout the course of the scheme, Delgado moved fraud proceeds amongst and between at least 30 corporate accounts over which he had signatory authority, allowing him to redistribute the funds and continue the operation of the scheme. Most of these transfers between accounts exceeded $10,0000. Despite the repeated movement of funds through and between these accounts, the source of the funds was victim investments (fraud proceeds) generated through the Ponzi scheme.

33

74.     The five accounts below each received funds directly from victim investors as detailed below (rounded), which eventually made their way into the accounts used to fund the purchase or lease of the Defendant Assets and/or loan payments related to the Defendant Assets:

| Acct. Holder | Acct No. Ending | Date Range | Victim Deposits |
|---|---|---|---|
| Goliath | JPMC 0305 | January 2023-June 2025 | $253,000,000.00 |
| GVI International | JPMC 7812 | June 2025-September 2025 | $8,500,000.00 |
| Goliath | BOA 9136 | August 2025-September 2025 | $75,000,000.00 |
| GVI International | BOA 0475 | August 2025-September 2025 | $22,000,000.00 |
| Goliath | LMB 1353 | August 2025-October 2025 | $41,900,000.00 |

75.     On February 11, 2022, Delgado retitled JPMC 0305 to the name of Goliath Ventures Inc.;[7] it served as a main account into which victims deposited their investment funds. As discussed earlier, from January 2023 through June 2025, approximately $253 million was deposited into JPMC 0305, all of which was money victims deposited based upon fraudulent representations by Delgado and Goliath. The deposits and transfers frequently exceeded $10,000.00. In May 2025, in anticipation of JPMC 0305 being closed by the bank, approximately $368,000 was transferred from JPMC 0305 to Goliath's BOA 9136, which as reflected in the chart above also received $75 million directly from victim investors.

---

[7] Delgado originally opened JPMC 0305 on August 17, 2020 on behalf of Gen-Z Venture Firm. In September 2021, Gen-Z Venture Firm changed its name to Goliath.

76.    On or about May 15, 2025, Goliath BOA 9149 was opened listing Delgado as President, as well as the Controller of Goliath, and another employee as signers on the account. Between May 2025 and September 2025, BOA 9149 received approximately $18.7 million in deposits from BOA 9136, which as just discussed received $75 million in fraud proceeds directly from victims. BOA closed this account in January 2026.

77.    On or about June 20, 2025, GVI International Inc. opened JPMC account ending in 7812 ("JPMC 7812"), listing Delgado and Goliath's Controller, as signers on the account. According to public records from the State of Wyoming, GVI International was incorporated in May 2025, a month before JPMC 7812 was opened. Corporate records indicate Delgado was President of GVI International.

78.    Between June 2025 and September 2025, JPMC 7812 received approximately $8.5 million in deposits from victim-investors directly and over $12.2 million from BOA, JPMC and LMB accounts listed in the chart above, which were also funded by victim-investors.  Specifically, fraud proceeds were transferred into JPMC 7812 from other victim-funded accounts as follows:

> a.    from June 2025 through August 2025, approximately $10 million from BOA 0475;
>
> b.    on July 18, 2025 approximately $2 million from BOA 9149; and
>
> c.    on September 8, 2025, approximately $225,000 from LMB 1892.

79.    On or about August 14, 2025, after BOA indicated it would be closing

Goliath's accounts, Goliath LMB account ending 1353 ("LMB 1353") was opened

listing Delgado and the Controller as signers on the account. Between August 2025

and November 2025, LMB 1353 received approximately $41.9 million in victim

deposits. It also received approximately $13.8 million in transfers from victim-funded

accounts, as described below:

> a.  from August 2025 through September 2025, approximately $7.8
>
>     million was transferred from BOA 9136; and
>
> b.  from August 2025 through September 2025, approximately $6
>
>     million was transferred from JPMC 7812.

80.    On or about August 22, 2025, Goliath's LMB account ending 1892

("LMB 1892") was opened listing Delgado and Goliath's Controller as signers on the

account. Between August 2025 and November 2025, LMB 1892 received

approximately $7 million in deposits. LMB 1892 was exclusively funded with

transfers from LMB 1353, which as discussed above was funded with fraud proceeds.

81.    Delgado used approximately $5.8 million of the fraud proceeds in these

accounts to purchase luxury goods rather than invest in liquidity pools as promised.

For instance, he spent (approximately) $2 million at Louis Vuitton, $1 million at

Mayors, $1.3 million at Tiffany & Co., $1.4 million at Audemars Piguet, and $100,000 at Cartier.[8]

82.    Delgado also used fraud proceeds from these accounts to purchase real property and vehicles. Between August 2024 and September 2025, he spent almost $17 million to buy five homes and office space. And between January 2023 and April 2025, he spent more than $2.5 million to purchase, lease, or pay off loans on eleven vehicles. Each of these purchases or loan satisfactions, except for the purchase of the Rolls Royce Cullinan, was a monetary transaction knowingly conducted by Delgado with more than $10,000 in proceeds of wire fraud, in violation of 18 U.S.C. § 1957. In addition, Delgado used fraud proceeds to make mortgage payments on a home he had purchased in 2021. The chart below lists the Defendant Assets as well as their purchase price and acquisition date.

| Acquisition Date | Defendant Asset | Purchase Price |
|---|---|---|
| 9/5/2025 | 5271 Isleworth Country Club Drive, Windermere, FL | $8.5 million |
| 7/31/2025 | 141 S. Phelps Avenue, Winter Park, Fl | $3.2 million |
| 5/29/2025 | 189 S. Orange Avenue, Unit 1800S, 1810S, 1820S & 1870S, Orlando, FL | $3.2 million |
| 4/22/2025 | 2025 Lamborghini Revuelto | $719,517.01 |
| 4/21/2025 | 2024 Rolls Royce Ghost | $379,995 |
| 4/9/2025 | 2024 Bentley Bentayga | $285,540 |
| 3/30/2025 | 2024 Lamborghini Huracán EVO Spyder | $473,723 |
| 3/19/2025 | 2025 Cadillac Escalade V | $238,561.25 |
| 3/4/2025 | 2024 Lincoln Navigator L | $125,862.37 |
| 2/13/2025 | 17416 Bal Harbour Drive, Winter Park, FL | $740,000 |

---

[8] Delgado has surrendered many of these items to the United States. The United States will forfeit them in a separate proceeding. Investigators are also working to locate and seize additional assets subject to forfeiture.

| Acquisition Date | Defendant Asset | Purchase Price |
|---|---|---|
| 12/5/2024 | 222 Pawnee Trail, Kissimmee, Fl | $862,500 |
| 8/5/2024 | 7333 Bella Foresta Place, Sanford, FL | $1.65 million |
| 4/12/2024 | 1951 Mercury | $52,000 |
| 1/12/2024 | 2017 Mercedes Benz C300 | $15,000 |
| 10/27/2023 | 2023 Rolls Royce Cullinan | $472,350 |
| 9/5/2023 | 2022 Mercedes Benz Sprinter | $235,804.96 |
| 10/23/2022 | 2022 GMC Sierra HD | $93,963 |
| 12/20/2021 | 746 Cavan Drive, Apopka, FL | $725,000 |

### A.    Real Property

#### 1.    *The real property located at 5271 Isleworth Country Club Drive, Windermere, Florida 34786, titled in the name of Christopher Delgado*

83.    On September 5, 2025, Delgado bought 5271 Isleworth County Club Drive, Windermere, Florida 34786 ("the Isleworth Property") for approximately $8,500,000. It is a 7-bedroom, 10.5-bathroom home with approximately 11,400 square feet, situated on a 1.17 acre lot on the Isleworth Country Club golf course. Below are pictures of the luxury residence:





84.    On July 30, 2025, Delgado directed an electronic transfer of $500,000 from BOA 9136, which was funded with fraud proceeds, to an Orlando law firm that he retained to represent him in purchasing the Isleworth Property.

85.    On September 4, 2025, Delgado directed an electronic transfer of $5,628,569.57 from LMB 1353 to the law firm, again using fraud proceeds to fund his purchase of the Isleworth Property.

86.    To complete the purchase, he directed a final electronic transfer of $2,320,010.49 from LMB 1353 to the law firm.

87.    The entire purchase price was paid with fraud proceeds, funds he obtained from victims who believed they were investing in liquidity pools.

88.    For 2025, Delgado owed $78,658.86 in property taxes on the Isleworth Property. He never paid them.

**2.**   ***The real property located at 141 S. Phelps Avenue, Winter Park, Florida 32789, titled in the name of Christopher Delgado and Andie Delgado***

89.   Approximately two weeks before he bought the Isleworth Property for $8,500,000, on July 14, 2025, Delgado directed an electronic transfer of $325,000 from BOA 9136 to Secured Land Transfer LLC, the title company that handled the closing for his purchase of the real property located at 141 S. Phelps Avenue, Winter Park, Florida 32789 ("Phelps Property") for approximately $3,200,000. The property was titled to Delgado and his wife, Andie Delgado.

90.   The Phelps Property, which is pictured below, is a six-bedroom, six-bathroom, luxury home with almost 6,000 square feet of living space and a pool, in the exclusive Windsong community.



91.   On July 30, 2025, Delgado directed an electronic transfer of $942,365.68 from BOA 9136 to Secured Loan Transfer toward the purchase of the Phelps Property.

92.     On or about July 31, 2025, Delgado completed the purchase of the Phelps Property, relying on a $1,995,000 mortgage from Luminate Bank to pay the remaining amount due at closing.

93.     Luminate Bank sold the loan immediately after closing. Delgado paid at least $51,626.64 in payments to Carrington Mortgage Services using fraud proceeds:

   a.     a $17,208.89 payment made from BOA 9149 in August 2025;

   b.     a $17,208.89 payment from LMB 1892 in September 2025; and

   c.     a $17,208.88 payment from LMB 1892 in November 2025.

Because the taxes were escrowed by the mortgage company, the 2025 property taxes have been paid. However, Delgado has stopped paying the mortgage.

### 3.     *The real property located at 17416 Bal Harbour Drive, Winter Garden, Florida 34787, titled in the name of Habibi Holdings LLC*

94.     Approximately five months before he bought the Phelps Property, on February 13, 2025, Delgado purchased 17416 Bal Harbour Drive, Winter Garden, FL 34787 (the "Bal Harbour Property") for $740,000. Delgado titled the house to Habibi Holdings LLC, which he formed on or about January 23, 2025. The home, which is pictured below, is a five-bedroom, 4.5-bathroom home located in the Waterside on Johns Lake subdivision, which has a clubhouse, fitness center, pool, and recreation facilities:

41



95.    Between January and February 2025, Delgado directed multiple electronic transfers from JPMC 0305, totaling $254,242.22, to Hometown Title Group Inc, to fund the purchase of the Bal Harbour Property. The first transfer was for $10,000 on January 22, 2025. Then, on February 13, 2025, he authorized a $224,225.03 transfer and a $20,017.19 transfer.

96.    To fund the remainder of the purchase price and closing costs, Delgado obtained a $518,000 mortgage.

97.    Delgado paid at least $45,245.90 in mortgage payments with fraud proceeds:

    a.    on March 31, 2025, he made a $ 4,524.59 payment from JPMC 5775;

    b.    from June 2025 through January 2025, he paid a total of $31,672.14 from BOA 7459; and

    b.    from October 2025 through November 2025, he paid a total of $9,049.18 from LMB 2031.

**4.      *The real property located at 222 Pawnee Trail, Kissimmee,
Florida 34747, titled in the name of Christopher Delgado***

98.      On September 25, 2024, Delgado directed an electronic transfer of $20,000 from JPM 0305 to Florida Guardian Title & Escrow, the title company that handled the closing on his purchase of the real property located at 222 Pawnee Trail, Kissimmee, Florida 34747 ("Pawnee Property"). Delgado bought the house on December 6, 2024 for $1,115,000. The Pawnee Property, pictured below, is a Mediterranean-style, single-story house with more than 6,500 square feet of living space. It is located in the Happy Trails Equestrian Community on a 5-acre lot on the Champions Gate's National Golf Course.



99.      On November 15, 2004, Delgado directed a $475,000 electronic transfer from JPMC 8893 to the title company.

100.    Finally, on December 6, 2024, Delgado directed an electronic transfer of $21,000 from JPM 0305 to the title company, bringing his total down payment on the property to $316,000—all of which was fraud proceeds.

101.    The same day, Delgado closed on the purchase of the Pawnee Property. To cover the remaining purchase price and closing costs, he obtained a $862,500 mortgage for the Pawnee Property from Newrez LLC.

102.    Delgado paid at least $87,815.28 in monthly payments towards the Newrez LLC mortgage from the accounts funded with fraud proceeds:

      a.     from February 2025 through May 2025, he made $35,160.48 in payments from JPMC 0305.

      b.     from June 2025 through September 2025, he made $35,118.76 in payments from BOA 9136.

      c.     From October 2025 through November 2025, $17,536.04 in payments were made from LMB 1892.

      **5.**     ***The real property located at 189 S. Orange Avenue, Orlando, Florida 32801, Units 1800S, 1810S, 1820S, and 1870S, titled in the name of Habibi HQ LLC, a Wyoming limited liability company***

103.    On May 29, 2024, Delgado purchased Units 1800S, 1810S, 1820S, and 1870S, along with approximately 30 parking spots, in the Plaza South Tower, a 20-story Class A office building, located at 189 S. Orange Avenue, in downtown Orlando ("Plaza South Units"). The building is pictured below. The Plaza South Units are on the 18th floor and total approximately 12,000 square feet (roughly two-thirds of the 18th floor).



104.    Delgado bought the Plaza South Units for $3,200,000 million to serve as Goliath's headquarters. *Orlando Business Journal*, which had interviewed Delgado about the purchase, reported on July 15, 2025, that the design and buildout of the space was expected to cost an additional $5 million and be finalized by the end of 2025. https://www.bizjournals.com/orlando/news/2025/07/15/goliath-ventures-blockchain-chase-plaza-giving.html

105.    In or around March 2024, Delgado decided to purchase the Plaza South Units. He retained a law firm in Orlando to represent him in the transaction. In preparation for the purchase, on May 2, 2024, he created Habibi HQ LLC to hold title to the Plaza South Units.

106.    The Plaza South Units were purchased entirely with fraud proceeds. Approximately $3,100,000 of the purchase price was paid with proceeds of a loan from JPMC that was secured and later satisfied with fraud proceeds moved through JPMC 0305. The remaining $100,000 came directly from JPMC 0305.

107.    On or about March 13, 2024, Delgado transferred $10 million into JPMC U-9005 from JPMC 0305. As previously noted, JPMC 0305 received approximately $253 million from victim investors. It appears that the $10 million deposited into U-9005 served as collateral for a $9.4 million loan that Delgado subsequently obtained from JPMC.

108.    On or about March 26, 2024, $7 million in loan proceeds were deposited into JPMC account ending 9206 held by Kingsmen Group LLC and controlled by Delgado. The same day, the $7 million was transferred to a Dubai-based account under Delgado's control at Emirates NBD Bank.

109.    Those funds were subsequently transferred back to the United States to fund the purchase of the Plaza South Units, a purchase Delgado intended to make when he transferred the funds to Dubai.

110.    Delgado traveled to Dubai multiple times, purportedly on Goliath business. He posted pictures of his travel to Dubai on social media, presumably to add legitimacy to his claims that he was a successful businessman with professional connections and business in Dubai.

111.    In actuality, Delgado was not conducting legitimate business for Goliath in Dubai. Despite this fact, he spent millions of dollars of fraud proceeds on chartered flights, luxury accommodations, and high-end vehicles (a 2023 Ferrari 296 GTS and a 2023 Cadillac Escalade) to drive while in Dubai.

112.    On May 10, 2024, Delgado wired $1,000 from his Emirates Bank account to his law firm in Orlando as a test. After wire transaction fees, the law firm received $990. Seeing that the transaction was successful, Delgado transferred an additional $3,099,990 (after fees) from his Emirates Bank account to his law firm. In all, on May 10, 2024, the law firm received $3,100,980 from Emirates Bank.

113.    Then, on May 28, 2024, Delgado authorized the final $100,000 needed for the closing to be wired to his law firm from JPMC 0305.

114.    In or about September 2025, Delgado paid off the outstanding loan balance using the $10 million that had been held on deposit at JPMC. But for having the $10 million in funds obtained by investor victims as collateral for the loan, Delgado would not have obtained it. Therefore, $7 million transferred to Emirates Bank in Dubai, the $3,100,980 million transferred from Emirates Bank to the Orlando law firm, and the Plaza South Units are all traceable to fraud proceeds.

### 6.    *The real property located at 7333 Bella Foresta Place, Sanford, Florida 32771, titled in the name of Christopher Alexander Delgado*

115.    On June 11, 2024, Delgado directed an electronic transfer of $25,000 from JPMC 0305 to Citrus Closing, the title company that handled Delgado's purchase of the real property located at 7333 Bella Foresta Place, Sanford, Florida 32771 ("Bella Foresta Property"). This transfer was the first of two payments that funded the down payment for his $1,650,000 purchase of the Bella Foresta Property.

116.    The Bella Foresta Property, pictured below, is an exquisite Mediterranean-inspired pool home nestled on a lush 1-acre wooded lot in the exclusive, gated Bella Foresta community. It has 5 bedrooms and 6.5 bathrooms, including a private courtyard and guest casita, for a total of nearly 5,500 square feet of living space.



117.    On August 5, 2024, the day of the closing, Delgado directed an electronic transfer of $358,890.46 from JPM 0305 to Citrus Closing. Because, as discussed above, JPMC 0305 was funded with victim money, the full 383,890.46 down payment was made with fraud proceeds.

118.    On the same date, Delgado obtained a $1,320,000 mortgage from Change Lending, LLC to fund the remaining purchase price.

119.   Delgado paid monthly mortgage payments totaling $149,217.95 to Selene Finance, the loan servicer, using victim funds:

a.   from November 2024 through May 2025, he made $80,231.21 in payments from JPMC 0305;

b.   from June 2025 through September 2025, he made $45,991.16 in payments from BOA 9136; and

c.   from October 2025 through November 2025, he made $22,995.58 in payments from LMB 1892.

120.   Each of these mortgage payments was at least $11,400, and was made with more than $10,000 in wire fraud proceeds, in violation of 18 U.S.C. § 1957.

7.   ***The real property located at 746 Cavan Drive, Apopka, Florida 32703, titled in the name of Christopher Delgado and Andie Delgado.***

121.   On or about December 20, 2021, Delgado and his wife bought 746 Cavan Drive, Apopka, Florida, ("Cavan Property") for $725,000. They put down approximately $77,800 and relied upon a $647,200 mortgage to fund the remainder of the purchase price.

122.   The Cavan Property, pictured below, is a five bedroom, 3 bathroom, 4,350 square foot home in the gated community of Breckenridge. The house was built on the largest lot offered with conservation adjacent to the back yard and also provides access to the community pool and cabana.



123.    Although Delgado and his wife bought the property with clean funds, once the Goliath fraud scheme began, he made mortgage payments with fraud proceeds. As described below, from January 2023 through March 2026, Delgado made approximately $160,527.96 in payments to United Wholesale Mortgage, the loan servicer, through various accounts he controlled at JPMC, BOA, LMB, and CNB[9] that were funded with fraud proceeds:

    a.  from January 2023 through September 2025, Delgado made approximately $140,575.21 in payments from JPMC 7735;

    b.  in October 2025, Delgado made a $3,977.53 payment from LMB 1892;

---

[9]  Delgado opened GVI International City National Bank account ending 9574 in December 2025.  The account was funded by $1.3 million in deposits from two investor-victims and transfers from Delgado's CNB personal account ending 3966, which was primarily funded by $65,000 in investor deposits and more than $1.2 million Delgado obtained from selling high-end vehicles and a vessel. The high-end vehicles and vessel were originally purchased using fraud proceeds from JPMC 7812.

c. from December 2025 through January 2026, Delgado made approximately $7,955.06 in payments from BOA 9149; and

d. from February 2026 through March 2026, Delgado made approximately $8,020.16 in payments from City National Bank 9574.

Delgado did not make these payments in a consistent amount. Many of his payments were for between $3,661.49 and $4,042.63. On May 2, 2023, he made a $10,000 payment from JPMC 7735, one of his personal accounts that was funded with proceeds.

### B.    Vehicles

#### 1.    *2025 Lamborghini Revuelto, VIN: ZHWUC1ZM9SLA02300, registered to Christopher Delgado*

124.    On or about April 22, 2025, Delgado entered into a lease agreement with Porsche Leasing Ltd. for a 2025 Lamborghini Revuelto, VIN: ZHWUC1ZM9SLA02300, pictured below, purchased from Fields Motorcars in Orlando, Florida for $719,517.01.



125.   Delgado has paid approximately $193,733.01 for the lease of the Lamborghini Revuelto—all of which was fraud proceeds moved through Goliath accounts:

    a.   Delgado paid the $125,000 down payment from JPMC 0305;

    b.   in June 2025, he made a $7,525.89 payment from BOA 9136;

    c.   in August, November, and December 2025, he made a total of $30,103.56 in payments from BOA 9149;

    d.   in September and October 2025, he made a total of $15,051.78 in payments from LMB 1892; and

    e.   in January and February 2026, he made a total of $15,051.78 in payments from City National Bank account ending 9574, which as discussed above, was funded with fraud proceeds.

    *2.   2024 Rolls Royce Ghost, VIN: SCATD6C02RU222648, registered to Goliath Ventures, Inc. and Christopher Delgado*

126.   On or about April 21, 2025, Delgado bought a 2024 Rolls-Royce Ghost bearing VIN: SCATD6C02RU222648, pictured below, from Fields Motorcars in Orlando, Florida for $379,995. Delgado had the titled issued to himself and Goliath. BMW Financial Services NA LLC, which provided financing, holds a secured lien.



127.    Delgado made a $120,000 down payment from JPMC 0305, using fraud proceeds. He also paid subsequent monthly loan payments to BMW Financial of $4,802.20— totaling $43,219.60—with fraud proceeds:

    a.    from May 2025 through September 2025, he paid $28,813.20 in loan payments from BOA 9136;

    b.    in September 2025, $4,802.20 loan payment from JPMC 7812; and

    c.    from October 2025 through November 2025, he made $9,604.20 in loan payments from LMB 1892.

128.    Delgado also made three additional payments between December 2025 and February 2026, totaling $14,406.60, from another account funded with proceeds.

129.    Delgado is now in default on the loan.

### 3.   *2024 Bentley Bentayga, VIN: SJAHT2ZV0RC025272, registered to Christopher Delgado and Andie Delgado*

130.   Approximately two weeks before he bought the Rolls Royce, on or about April 9, 2025, Delgado leased a 2024 Bentley Bentayga, VINSJAHT2ZV0RC025272, pictured below, from Porsche Financial Services. The leasing company purchased the Bentley from Fields Motorcars in Orlando, Florida for $285,540.



131.   To pay for the leased Bentley, Delgado made a $50,000 down payment from JPMC 0305. He also made $5,031.91 monthly lease payments, totaling $30,191.46, from accounts funded by fraud proceeds:

      a.   from June 2025 through August 2025, he made $20,127.64 in lease payments from BOA 9136; and

      b.   from September 2025 through October 2025, he made $10,063.82 in lease payments from LMB 1892.

**4.** ***2024 Lamborghini Huracán EVO Spyder, VIN: ZHWUT4ZFXRLA26330, registered to Goliath Ventures, Inc. and Christopher Delgado***

132.    On or about March 30, 2025, nine days before he leased the Bentley, Delgado entered into a lease agreement with Porsche Leasing Ltd. for a 2024 Lamborghini Huracán EVO Spyder, VIN: ZHWUT4ZFXRLA26330, pictured below, purchased from Fields Motorcars in Orlando, Florida for $473,723.



133.    To pay for the lease, Delgado made a $75,000 down payment from JPMC 0305. He then made $5,568.33 monthly lease payments, for a total of $27,841.65, with fraud proceeds from other Goliath accounts:

    a.    from July 2025 through September 2025, he made $16,704.99 in lease payments from BOA 9149; and

    b.    from October 2025 through November 2025, he made $11,136.66 in lease payments from LMB 1892.

**5.**      *2025 Cadillac Escalade V, VIN: 1GYS9HR95SR147650, registered to Goliath Ventures, Inc.*

134.    Eleven days before he leased the Lamborghini Huracán, on or about March 19, 2025, Delgado purchased a white 2025 Cadillac Escalade V, VIN: 1GYS9HR95SR147650, from Ultimate Auto Boutique in Orlando, Florida for $238,561.25. The Escalade is pictured below:



135.    In addition, Delgado paid Ultimate Auto to customize the Escalade. The invoice Ultimate Auto issued to—as he liked to be called—"Lord Delgado" itemized the modification costs, which totaled $58,438.75. This brought the total cost of the Escalade to $297,000.

136.    Delgado paid the full $297,000 on January 10, 2025, using fraud proceeds from JPMC 0305.

### 6.    *2024 Lincoln Navigator L, VIN: 5LMJJ3TG2REL19131, registered to Goliath Ventures, Inc.*

137.    Approximately two weeks before he bought the Escalade, on or about March 4, 2025, Delgado purchased a 2025 Lincoln Navigator, VIN: 5LMJJ3TG2REL1913, pictured below, from Central Florida Lincoln, Orlando, Florida for $125,862.37 and titled it to Goliath.



138.    Once again, Delgado bought the luxury vehicle with fraud proceeds. He used a Goliath American Express Card to make a $5,000 down payment. The bill was later paid from JPMC 0305 on the same day $1.2 million in fraud proceeds was deposited by investor-victims.

139.    Delgado paid the remaining $120,862.37 with a cashier's check drawn from fraud proceeds held in JPMC 0305.

### 7.    *1951 Mercury, VIN: 51DA24185M, registered to David Stuart*

140.    On or about April 12, 2024, Delgado bought a white 1951 Mercury classic automobile, VIN: 51DA24185M, pictured below, from Classic Cars West,

located in Nevada City, California for $52,000. Delgado titled the 1951 Mercury to David Stuart. Delgado paid for the car with a wire transfer from JPMC 0305 that was funded with fraud proceeds.



### 8.   *2017 Mercedes Benz C300, VIN: 55SWF4JBXHU230429, registered to Goliath*

141.   On or about January 12, 2024, Delgado purchased a 2017 Mercedes-Benz C300, VIN: 55SWF4JBXHU230429, pictured below, for $15,000 in a private sale. The $15,000 was all fraud proceeds.



142.   Delgado paid for the Mercedes C300 with cash withdrawn from JPMC 0305. On January 11, 2024, he withdrew $10,000 in cash from 0305.  He withdrew another $10,000 in cash from the account the following day.

**9.      *2023 Rolls Royce Cullinan, VIN: SLATV4C02PU217321,***
***registered to Goliath Ventures, Inc. and Christopher Delgado***

143.    On or about October 27, 2023, Delgado purchased a 2023 Rolls Royce Cullinan, VIN: SLATV4C02PU217321, from Fields Motorcars in Orlando, Florida, for $472,350. Here is a picture of the Rolls Royce:



144.    Delgado traded in a 2021 Rolls Royce, resulting in a net trade-in down payment of $88,827.45. He financed the remainder of the purchase price. The monthly payments on the loan were $5,951.37, which Delgado made using fraud proceeds in Goliath accounts. In all, Delgado made at least $131,805.48 in payments on the Rolls Royce using fraud proceeds:

       a.      from December 2023 through May 2025, Delgado made $108,000 in loan payments from JPMC 0305;

       b.      from July 2025 through August 2025, Delgado made $11,902.74 loan payments from BOA 9136; and

c. from September 2025 through October 2025, $11,902.74 loan payments from LMB 1892.

145. Between November 2025 and February 2026, Delgado made four additional loan payments with proceeds, totaling $23,805.48.

146. Delgado is in default on the loan.

**10. 2022 Mercedes Benz Sprinter, VIN: W1X8EC3Y6NT121984, registered to Goliath Ventures, Inc.**

147. On or about September 5, 2023, Delgado purchased a 2022 Mercedes Benz Sprinter van, VIN: W1XBEC3Y6NT121984, pictured below, from Mercedes Benz of Boerne in Boerne, Texas for $235,804.95.



148. Delgado bought the Sprinter van with fraud proceeds transferred from JPMC 0305 in two payments: a $20,000 transfer and a $215,804.94 transfer.

60

*11.     2022 GMC Sierra HD, VIN: 1GT49PEY2NF310721, registered to David Stuart*

149.    On or about October 23, 2022, Delgado purchased a 2022 GMC Sierra HD pickup truck VIN: 1GT49PEY2NF310721, from Mullinax Ford in Orlando, Florida, for approximately $93,963. Mullinax Form received a $10,000 down payment. The remaining $83,963 was financed through Ally Bank with monthly payments of approximately $1,536 per month. However, Delgado routinely authorized $1,600 monthly payments.

150.    In all, Delgado used $96,600 in fraud proceeds from JPMC to pay for the GMC Sierra HD pickup truck. From January 2023 through February 2025, he authorized $41,600 in loan payments from JPMC 0305. Then, in March 2025, the same month that he bought the Lincoln Navigator and the Lamborghini Huracán, Delgado paid off the loan on the truck by making a $55,000 loan payment from JPMC 0305.

## CONCLUSION

151.    As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, probable cause exists to believe that the Defendant Assets are proceeds of wire fraud offenses, obtained in violation of 18 U.S.C. § 1343. Additionally, probable cause exists to believe that Defendant Assets are property involved in monetary transactions conducted in violation of 18 U.S.C. § 1957.

Therefore, the Defendant Assets are subject to civil forfeiture pursuant to 18 U.S.C. §

981(a)(1)(A) and (a)(1)(C).

Dated: May 21, 2026                    Respectfully Submitted,

                                       GREGORY W. KEHOE
                                       United States Attorney


                         By:    s/ Anita M. Cream
                                ANITA M. CREAM
                                Assistant United States Attorney
                                Florida Bar Number 56359
                                400 North Tampa Street, Suite 3200
                                Tampa, Florida 33602
                                (813) 274-6000 – telephone
                                E-mail: anita.cream@usdoj.gov


                                s/ Blain A. Goff
                                BLAIN A. GOFF
                                Assistant United States Attorney
                                Florida Bar Number 0109467
                                E-mail: blain.goff@usdoj.gov

## VERIFICATION

I, Richard Smith, hereby verify and declare under penalty of perjury, that I am a Special Agent with the Internal Revenue Service, and pursuant to 28 U.S.C. § 1746: (1) I have read the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents thereof; and (2) that the matters contained in the Verified Complaint are true to my own knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the Internal Revenue Service, as well as my investigation of this case together with other law enforcement agents. I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of May 2026.

_____
Richard Smith
Special Agent
Internal Revenue Service